**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| KEVIN J. MATTSON, | ) | Chapter 7 |
| | ) | Case No. 24-20188 PGC |
| Debtor. | ) | |
| | ) | |
| EDMOND J. FORD, ESQ., TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Proc. No. 26-2020 |
| v. | ) | |
| | ) | |
| SEVERIN M. BELIVEAU, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION TO DISMISS COUNTS I, II, IV, VI – IX, AND XI OF ADVERSARY PROCEEDING COMPLAINT PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 7012 AND FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

NOW COME Defendants, Severin M. Beliveau, Esq. ("Beliveau") and Cynthia Murray-Beliveau (together, "Defendants"), pursuant to Federal Rule of Bankruptcy Procedure 7012(b) and Federal Rule of Civil Procedure 12(b)(6), and request that the Court dismiss Counts I, II, IV, VI – IX, and XI of Plaintiff Edmond J. Ford, Esq., Chapter 7 Trustee's ("Plaintiff" or "Trustee") Complaint, dated September 23, 2026 ("Complaint"), against them for failure to state claims on which relief can be granted.

Counts I, II, IV, and VIII the Complaint (regarding partnership-theory claims and the prepetition secured-party sale of Debtor Kevin J. Mattson's ("Debtor" or "Mattson") membership interests in Newcastle Ventures, LLC ("Newcastle Ventures") to Defendants Alexander and Rachel Nevens (together, "Nevens")) must be dismissed because they are all prepetition claims of Debtor arising solely under state law and are barred by the res judicata doctrine.

The Trustee's actual intent fraudulent transfer claim in Count VII (concerning the secured-party sale of Debtor's membership interests in Newcastle Ventures and arising under § 544(b) of the United States Bankruptcy Code ("Code") and 14 M.R.S. § 3575(1)(A)) must be dismissed because the allegations of the claim do not plausibly state a claim for relief, nor could they ever under the circumstances.

The Trustee's actual intent fraudulent transfer claim in Count VI (concerning the Exit Agreement (defined herein) and arising under § 544(b) of the Code and § 3575(1)(A)) must be dismissed because the allegations of the claim do not plausibly state a claim for relief under the requisite elements of § 3575(1)(A), nor are they pled with requisite particularity under Federal Rule of Civil Procedure 9(b).

Count IX of the Complaint (arising under § 544(a) and relating to Harpers Development, LLC ("Harpers Development")) and Debtor's purported membership interests therein) must be dismissed because: (i) on its face, it fails to state a claim as a matter of fact and law; and (ii) under express Maine statutory law, 31 M.R.S. § 1573, the Trustee was not a hypothetical judicial lien or execution creditor with respect to Debtor's membership interests in Harpers Development on the filing date.

Count XI of the Complaint, which seeks disallowance of Beliveau's Proof of Claim (Claim No. 30-2) under § 502(b) in any amount in excess of $288,020, must be dismissed because the plain language of the Maine Business and Consumer Court's ("Business Court") Stipulated Judgment in favor of Defendants and against Mattson (underlying Claim 30-2) expressly and conclusively contradicts and rejects the Trustee's sole basis for his objection, and the Count legally and factually fails to state a claim upon which relief can be granted.

In support of their Motion to Dismiss, Defendants state as follows.

## I. Constitutional Authority, Jurisdiction, and Venue

1. The Court has constitutional authority to enter final orders on this Motion, it has jurisdiction over this case pursuant to 28 U.S.C. § 1334, this is a statutorily core matter pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (F), (H), and (O), and venue is proper pursuant to 28 U.S.C. § 1409(a).

## II. Discussion[1]

### A. Rule 12(b)(6) Legal Standard

2. "In litigating adversary proceedings in bankruptcy, the standards embedded in Federal Rule of Civil Procedure 12 apply. *See* Fed. R. Bankr. P. 7012; *see also ... In re Moultonborough Hotel Grp., LLC*, 726 F.3d 1, 4 (1st Cir. 2013) (explaining that '[t]he legal standards traditionally applicable to ... motions to dismiss apply without change in bankruptcy proceedings')." *In re Curran*, 855 F.3d 19, 24 (1st Cir. 2017).

3. At the Rule 12(b)(6) stage, a complaint's well-pleaded allegations must be accepted as true and all reasonable inferences drawn in the plaintiff's favor. *Lowe v. Mills*, 68 F.4th 706, 713 (1st Cir. 2023), *cert. denied*, 144 S. Ct. 345 (2023) (citation omitted). The Court need not credit conclusory legal allegations. *Cheng v. Neumann*, 51 F.4th 438, 443 (1st Cir. 2022).

> In order to survive dismissal, a complaint need not set forth 'detailed factual allegations,' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007), but it must 'contain sufficient factual matter ... to state a claim to relief that is plausible on its face,' *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). If the facts articulated in the complaint are 'too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture,' the complaint is vulnerable to a motion to dismiss. *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc).

*In re Curran*, 855 F.3d at 25.

---

[1] Rather than reciting alleged facts in the Complaint in a standalone initial section, alleged facts relevant to each Count for which dismissal is sought are incorporated into each argument herein.

> *Ocasio–Hernández* points the way to the proper handling of a motion to dismiss. Step one: isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements.... Step two: take the complaint's well-pled (*i.e.,* non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.... Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a "context-specific" job that compels us "to draw on" our "judicial experience and common sense." *Iqbal,* 129 S. Ct. at 1949, 1950. And in performing our review, we realize too that we can consider (a) "implications from documents" attached to or fairly "incorporated into the complaint," (b) "facts" susceptible to "judicial notice," and (c) "concessions" in plaintiff's "response to the motion to dismiss." *Arturet–Vélez v. R.J. Reynolds Tobacco Co.,* 429 F.3d 10, 13 n. 2 (1st Cir. 2005); *see also Haley v. City of Boston,* 657 F.3d 39, 44, 46 (1st Cir. 2011).

*Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55–56 (1st Cir. 2012) (citations, footnote, and quotations omitted); *Ocasio–Hernandez v. Fortuno–Burset*, 640 F.3d 1, 12 (1st Cir. 2011) ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal,* 129 S. Ct. at 1949 (quoting *Twombly,* 550 U.S. at 557, 127 S. Ct. 1955).").

4. Finally, despite Plaintiff's tactical decision to refer to and extensively cite from the Exit Agreement, the Settlement Agreement, Secured Party Sale, Transfer Agreement, Claim 30, and Stipulated Judgment in his Complaint, but not actually append those documents to the pleading, this Court may nonetheless consider the entirety of those documents and materials in its Rule 12(b)(6) analyses.[2]

> [I]t is well-established that in reviewing the complaint, we "may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment." *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996) (citing *Watterson v. Page,* 987 F.2d 1, 3–4 (1st Cir.1993) (explaining that the main problem of looking to documents outside the complaint—lack of notice to plaintiff—is dissipated "[w]here plaintiff has actual notice ... and has relied upon these documents in framing the complaint")). "Were the rule

[2] As defined herein or in the Complaint (¶ 65, Exit Agreement) (¶ 146, Settlement Agreement), (¶ 250, Secured Party Sale), (¶ 312, Transfer Agreement), (¶ 345, Claim 30), (¶¶ 356 – 360, Judgment and Order issued in <u>Severin M. Beliveau, *et al.* v. Kevin J. Mattson</u>, Docket No. BCD-CIV-2023-00031 ("<u>Business Court Action</u>")).

> otherwise, a plaintiff could maintain a claim ... by excising an isolated statement from a document and importing it into the complaint...." *Id.*; *see also Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 454 (7th Cir.1998) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.").

*Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000).

### B. Counts I, II, IV, and VIII of the Complaint are Barred by the Res Judicata Doctrine and Must be Dismissed as a Matter of Law

5. The Trustee's state-law claims alleged in Counts I, II, IV, and VIII of the Complaint against Beliveau are legally barred under the applicable res judicata doctrine by the final Stipulated Judgment[3] issued prepetition by the Business Court in favor of Beliveau and against Mattson in the Business Court Action. Those claims must therefore be dismissed.

6. In Counts I, II, IV, and VIII of his Complaint, the Trustee alleges four claims against Beliveau arising under Maine state law. They are follows:[4]

- Count I (Declaration of Partnership under 31 M.R.S. § 1022)
- Count II (Fiduciary Duty and Accounting under 31 M.R.S. § 1044)
- Count IV (Partner Liability/Partnership Debts under 31 M.R.S. § 1087)
- Count VIII (Violation of Maine Article 9 under 11 M.R.S. § 9-1610)[5]

None of these claims arise under, or are dependent upon, the Code, Chapter 5 in particular.

---

[3] *See* Order Granting Plaintiffs' Uncontested Motion to Enforce Settlement Agreement and Incorporated Memorandum of Law, dated July 23, 2024 ("Judgment Enforcing Settlement"), issued by the Business Court in the Business Court Action and rendering a stipulated judgment in favor of Defendants and against Mattson in the original principal amount of $835,172.38, and the Order of the Business Court, dated September 9, 2024 ("Order"), correcting the Judgment Enforcing Settlement "such that the judgment against him [Mattson] is in the principal amount of $288,020.00, not $835,172.38." The Judgment Enforcing Settlement and Order, together, the "Stipulated Judgment," true copies of which are appended to Beliveau's Amended Proof of Claim, dated October 30, 2026, in the amount of $343,603.92 (plus accruing post-judgment interest, expenses, and fees) (Claim No. 30-2)), which is attached hereto as Exhibit A.

[4] *See* Complaint ¶¶ 94 – 100 (Count I); ¶¶ 101 – 133 (Count II); ¶¶ 169 – 179 (Count IV); ¶¶ 290 – 297.

[5] Counts I, II, IV, and VIII, collectively, "State Law Claims".

7. As alleged in the Complaint, in 2016 and 2017, Beliveau and Mattson negotiated and entered into the Exit Agreement. Complaint ¶¶ 64, 65.[6] Throughout paragraphs 67 – 93 of the Complaint, the Trustee extensively alleges that Beliveau owed multiple obligations to Mattson and their alleged and purported "partnership" under the Exit Agreement, many of which he allegedly breached. *See* Complaint ¶¶ 94 – 133 (Counts I and II); ¶¶ 169 – 179 (Count IV).[7]

8. The Complaint further alleges that Mattson's and Beliveau's "partnership" exists through today, "and otherwise at least through October 31, 2023[.]" Complaint ¶ 95; *see also* Settlement Agreement and Mutual General Release, dated October 31, 2023 ("Settlement Agreement") attached hereto with Exhibit A, pp. 1-2 (Whereas provisions).

9. The Complaint alleges that in early 2023 "the Beliveaus sued Mattson. Severin Beliveau et al. v. Kevin Mattson, et al. Docket No. PORSC-CV-2023-057. (the '2023 Action')." Complaint ¶ 135. The 2023 Action was subsequently transferred to the Business Court. *Id.* ¶¶ 354 – 360; *see also* Settlement Agreement.

10. In the transferred Business Court Action, Beliveau asserted, *inter alia*, breach of contract and contractual indemnity claims against Mattson arising from his multiple breaches of the Exit Agreement and his obligations thereunder, and for which Beliveau sought damages against Mattson in excess of $4.5 million dollars. *See* Settlement Agreement, pp. 1-2.

[6] A true copy of the Exit Agreement is attached hereto as Exhibit B. It was executed on August 22, 2017. *Id.*

[7] *See, e.g.* Complaint ¶ 79 ("The Exit Agreement is a written acknowledgment by Mattson and Beliveau that they are co-owners of a business for profit [i.e., a "partnership"]: 'Severin and Kevin are involved in various real estate projects in Maine through their ownership interests in multiple entities which are more particularly described in Exhibit A (the 'Projects')'. *Exit Agreement,* p. 1."); *see also* Complaint ¶ 37 ("Mattson and Beliveau co-owned that real estate development venture for the purpose of making money."); ¶ 95 ("From sometime around 1998 through today and otherwise at least through October 31, 2023, [Mattson] and Beliveau associated together as co-owners for profit of a business developing, investing in, managing, financing, syndicating and selling real estate. (The 'Business')."); ¶ 100 ("[Mattson] and Beliveau formed a partnership. Me. Rev. Stat. tit. 31, § 1022.").

11. In turn, Mattson asserted counterclaims against Beliveau in the Business Court Action for, *inter alia,* Beliveau's alleged breaches of the Exit Agreement, claimed violations of Article 9 of Maine's Uniform Commercial Code (including 11 M.R.S. §§ 9-1625 and 9-1626) arising from Beliveau's purported failure to conduct a commercially reasonable secured-party sale of Mattson's membership interests in Newcastle Ventures and for other relief. *See* Settlement Agreement, pp. 1-2 (Whereas provisions); *see also* Defendants' Answer to Amended Complaint, Affirmative Defenses, and Counterclaims filed in Business Court Action attached with Exhibit A.[8]

12. "The [Business Court Action] was resolved by the Settlement Agreement date [sic] October 31, 2023" between, *inter alia*, Beliveau and Mattson. Complaint ¶ 146; *see also* Exhibit A.

13. The Settlement Agreement expressly contemplates the issuance of a stipulated judgment in favor of Beliveau and against Mattson in the event that Mattson breached the Settlement Agreement or its related documents. *See* Exhibit A (Settlement Agreement ¶ 2(b)).

14. Mattson thereafter breached the Settlement Agreement and, on July 23, 2024, the Business Court issued its Judgment Enforcing Settlement in the Business Court Action as a result. *See* Complaint ¶¶ 358, 359; *see also* Exhibit A attached hereto. The Judgment Enforcing Settlement expressly provides that:

> Stipulated Judgment is entered in favor of Plaintiffs, Severin M. Beliveau, Esq. and Cynthia Murray Beliveau, against Defendant Kevin J. Mattson, in the principal amount of $835,172.38, with post-judgment interest at the rate of 10.79%, plus

[8] The Court may properly take judicial notice of the Counterclaim, Rule 60(b) Motion (defined herein), and Business Court Complaint (defined herein) for purposes of this Motion pursuant to Federal Rule of Evidence 201(c)(2). *See also Giragosian v. Ryan*, 547 F.3d 59, 66 (1st Cir. 2008) (First Circuit confirming subsequent claims barred by res judicata) ("A court may consider matters of public record in resolving a Rule 12(b)(6) motion to dismiss…. Matters of public record ordinarily include 'documents from prior state court adjudications.' *Boateng v. InterAmerican Univ., Inc.*, 210 F.3d 56, 60 (1st Cir.2000). Further, use of the state-court judgment is not a 'surprise' or otherwise 'unfair.' Appellant was aware the federal magistrate judge was considering the state-court documents and he was given an opportunity to present material pertinent to the documents' effect on his federal action. Thus, consideration of the state-court judgment in this case is entirely proper.").

> allowable interest, costs, and other expenses incurred from and after that date in accordance with applicable law.

*See* Judgment Enforcing Settlement (Exhibit A) ¶ B (emphasis added).

15. On September 9, 2024, prepetition, the Business Court issued its Order granting Mattson's Motion Seeking Relief from Order Pursuant to Maine Rule of Civil Procedure 60(b), dated August 16, 2024 ("Rule 60(b) Motion"), and "correct[ing]" the Judgment Enforcing Settlement "such that the judgment against him [Mattson] is in the principal amount of $288,020.00, not $835,172.38." *See* Complaint ¶¶ 354 – 359; *see also* Order (Exhibit A) (emphasis added); *see also* Rule 60(b) Motion attached hereto as Exhibit D.

16. On September 12, 2024 ("Filing Date"), Mattson's "bankruptcy proceeding was commenced . . . [and] Plaintiff was appointed the Chapter 7 Trustee in this matter by order entered February 14, 2025." Complaint ¶¶ 8, 10.

**1. Res Judicata Standard**

17. "Under *res judicata,* a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. *Allen v. McCurry,* 449 U.S. 90, 94[]. Generally, a court-approved settlement receives the same *res judicata* effect as a litigated judgment[.]" *In re Medomak Canning*, 922 F.2d 895, 900 (1st Cir. 1990).

> A judgment that is entered with prejudice under the terms of a settlement, whether by stipulated dismissal, a consent judgment, or a confession of judgment, is not subject to collateral attack by a party or a person in privity, and it bars a second suit on the same claim or cause of action…. Such a judgment has the force of res judicata until further order of that or a higher court modifying that consent judgment.

*Langton v. Hogan*, 71 F.3d 930, 935 (1st Cir. 1995) (citation omitted).

18. Because the Stipulated Judgment was issued by the Business Court in the Business Court Action, this Court must apply Maine's res judicata principles in determining whether the Trustee's State Law Claims are barred in this Adversary Proceeding.

19. "[A] judgment rendered in a state court is entitled to the same preclusive effect in federal court as it would be given within the state in which it was rendered." []*In re Sonus Networks, Inc.*, 499 F.3d 47, 56 (1st Cir. 2007)[]. Hence, the preclusive effect of the State Court Final Judgment is determined under Maine law." *Kittery Point Partners, LLC*, 623 B.R. 825, 838 (B.A.P. 1st Cir. 2021), *aff'd sub nom. In re Kittery Point Partners, LLC*, 858 Fed. Appx. 386 (1st Cir. 2021) (citations omitted).

> The Maine Law Court opined that "[t]he doctrine of *res judicata* is a court-made collection of rules designed to ensure that the same matter will not be litigated more than once." *Macomber v. MacQuinn-Tweedie*, 834 A.2d 131, 138 (Me. 2003).... The res judicata doctrine "has two components: collateral estoppel, also known as issue preclusion, and claim preclusion." *Fed. Nat'l Mortg. Ass'n v. Deschaine*, 170 A.3d 230, 236 (Me. 2017)[]…. Issue preclusion is not implicated here, so our focal point is claim preclusion.
>
> This component of res judicata "bars the relitigation of claims if: (1) the same parties or their privies are involved in both actions; (2) a valid final judgment was entered in the prior action; and (3) the matters presented for decision in the second action were, or might have been, litigated in the first action."…. Claim preclusion is based on the idea that the precluded litigant had the opportunity and incentive to fully litigate the claim in an earlier action, so that all matters that were or could have been adjudicated in the earlier action on the claim are considered to have been finally settled by the first judgment.

*Kittery Point Partners, LLC*, 623 B.R. at 838 (citations and quotations omitted).

> The doctrine of res judicata ... has two components: collateral estoppel, also known as issue preclusion, and claim preclusion…. Claim preclusion bars the relitigation of claims if: (1) the same parties or their privies are involved in both actions; (2) a valid final judgment was entered in the prior action; and (3) the matters presented for decision in the second action were, or might have been, litigated in the first action.

*Wilmington Tr. Co. v. Sullivan-Thorne*, 2013 ME 94, ¶¶ 6-7, 81 A.3d 371, 374–75 (quotations and citations omitted).

**2. The Trustee is in Privity with Mattson with Respect to the State Law Claims**

20. The Trustee is in privity with Mattson for purposes of res judicata and the State Law Claims because the Trustee is the statutory successor-in-interest to Mattson, as Debtor in this Chapter 7 case, with respect to any prepetition state-law claims possessed by Mattson as of the Filing Date. *See* 11 U.S.C. §§ 323, 541(a), 704(a)(1).

21. The Law Court has stated that "privity is created when two or more persons have a mutual or successive relationship to the same rights of property…. We further recognize that substance over form controls the inquiry into whether privity will be found." *Ne. Harbor Golf Club, Inc. v. Town of Mount Desert*, 618 A.2d 225, 227 (Me. 1992) (emphasis added) (citing *Arsenault v. Carrier*, 390 A.2d 1048, 1051 (Me. 1978) ("Although the meaning of the term 'privity' for res judicata purposes may be elusive,…. we have generally referred to it as a mutual or successive relationship to the same rights of property.") (citation omitted).

22. Unlike claims and causes of action arising under the Code, such as Chapter 5 claims, "[u]nder section 323 of the Bankruptcy Code, the trustee succeeds to a debtor's rights as he or she becomes the estate's representative and may sue or be sued." *In re Gaudette*, 241 B.R. 491, 497 (Bankr. D.N.H. 1999).

> [L]awsuits that a trustee may bring fall into two categories: (1) those brought by the trustee as successor to the debtor's interest in the estate under section 541, and (2) those brought under one or more of the trustee's avoiding powers. With respect to the former, the trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor. The trustee is, of course, subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor.

*In re Gaudette*, 241 B.R. at 497 (citations omitted) (emphasis added).

> The bankruptcy trustee has exclusive standing to assert those state law claims that the debtor could have raised as of the commencement of the bankruptcy proceedings…. A trustee has standing to pursue bankruptcy and state common-law claims on behalf of the debtor since the trustee stands in the shoes of the debtor and has the right to bring whatever actions the debtor could bring on its own behalf. By the same token, the bankruptcy estate, as successor to the debtor's causes of action, is subject to the same defenses that the debtor would have faced.

*Feinman v. Lombardo*, 214 B.R. 260, 265 (D. Mass. 1997) (citations and quotations omitted); *Hutchins v. Shatz, Schwartz & Fentin, P.C.*, 494 B.R. 108, 114 (D. Mass. 2013) ("causes of action belonging to the *debtor* at the commencement of the [bankruptcy] case are included within the definition of property of the estate.").

23. "The four counts (negligence, breach of contract, negligent misrepresentation and the statutory claim for unfair or deceptive practices) all clearly could have been asserted by the debtor, RCG. The trustee steps into the shoes of the debtor for the purposes of asserting or maintaining the debtor's causes of actions, which become property of the estate." *In re Rare Coin Galleries of Am., Inc.*, 862 F.2d 896, 901 (1st Cir. 1988).

24. Here, the Trustee has standing to assert the State Law Claims against Beliveau only because they became property of the estate as of the Filing Date under § 541 of the Code and the Trustee, as the representative of the estate succeeding to Debtor's rights under § 323, is the individual tasked by § 704(a)(1) of the Code to "collect and reduce to money" those prepetition state-law claims "as expeditiously as is compatible with the best interests of parties in interest." *Cf. In re Medomak Canning*, 922 F.2d at ("For purposes of determining the applicability of *res judicata* here, identity of interests is equivalent to privity.").

25. For these reasons, under applicable Maine law, the Trustee is in privity with Debtor for purposes of res judicata and the first element of the doctrine is met. *See also Bezanson v. First Nat. Bank of Boston*, 633 A.2d 75, 76 (Me. 1993) ("The Bank sought dismissal of the action on

the basis of *res judicata.* The Superior Court (*Lipez, J.*) granted the Bank's motion to dismiss, agreeing with the Bank that the Rule 41(b)(1) dismissal was a valid final judgment . . . that Bezanson, as [Chapter 7] trustee, was in privity with Totman's [debtor]; and that the claims pursued by Bezanson arose from the same aggregate of connected operative facts as the previously dismissed action.") (emphasis added) (reversed on other grounds).

**3. The Stipulated Judgment is a Final Judgment for Purposes of Res Judicata**

26. Under Maine Law, stipulated judgments issued by Maine courts in furtherance of settlement agreements between litigants in underlying litigation are deemed final judgments for purposes of res judicata. *See, e.g., Berwick Ins., Inc. v. Linscott*, 684 A.2d 795, 797 (Me. 1996) ("Following a hearing on Linscott's motion for a summary judgment in *Berwick II,* the court granted a summary judgment in favor of Linscott on the ground that the SMA action operated as *res judicata* on *Berwick II* and prevented Berwick from relitigating the issue of whether it was bound by the terms of the settlement agreement."); *see also Allen v. Campbell*, 2010 WL 1558123 (Me. Super.) (Horton, J.) ("Mr. Allen's contention that the 2006 defamation action did not result in a final judgment is obviously incorrect – the judgment plainly implements the parties' settlement agreement.").

27. The same is true in the First Circuit.

> When a dispute of law exists between parties to a case and they agree to a settlement of that dispute and entry of a judgment with prejudice based on that settlement, then the terms of that judgment in relation to that legal issue are subject to res judicata principles. A judgment that is entered with prejudice under the terms of a settlement, whether by stipulated dismissal, a consent judgment, or a confession of judgment, is not subject to collateral attack by a party or a person in privity, and it bars a second suit on the same claim or cause of action….. Such a judgment has the force of res judicata until further order of that or a higher court modifying that consent judgment.

*Langton*, 71 F.3d at 935 (citation omitted).

28. The Business Court's Stipulated Judgment issued in the Business Court Action is a final judgment for res judicata purposes and the second prong of the test is satisfied.

**4. The Trustee's State Law Claims Were Actually Asserted and Litigated in <u>Business Court Action, or They Could Have Been Pursued in that Case</u>**

29. "Res judicata prevents 'a party and its privies ... from relitigating claims or issues that have already been decided.' *Id.* 'The doctrine of res judicata is grounded on concerns for judicial economy and efficiency, the stability of final judgments, and fairness to litigants.' *Lewis v. Me. Coast Artists,* 2001 ME 75, ¶ 9, 770 A.2d 644 (quotation marks omitted)." *Wilmington Tr. Co.*, 2013 ME 94, ¶¶ 6-7, 81 A.3d at 374–75.

> To determine whether the matters presented for decision in the instant action were or might have been litigated in the prior action, we examine "whether the same 'cause of action' was before the court in the prior case." *Connecticut Nat'l Bank v. Kendall,* 617 A.2d 544, 547 (Me.1992). We apply a transactional test to define a cause of action, pursuant to which
>
> the measure of a cause of action is the aggregate of connected operative facts that can be handled together conveniently for purposes of trial. A prior judgment bars a later suit arising out [of] the same aggregate of operative facts even though the second suit relies on a legal theory not advanced in the first case, seeks different relief than that sought in the first case, and involves evidence different from the evidence relevant to the first case.

*Johnson v. Samson Const. Corp.*, 1997 ME 220, ¶ 6, 704 A.2d 866, 868 (citations omitted).

> In evaluating the application of this prong of the doctrine, Maine courts focus on "whether the same cause of action was before the court in the prior case." <u>Deschaine</u>, 170 A.3d at 236 (quoting *Wilmington Tr. Co.*, 81 A.3d at 375). The court must consider whether the causes of action "were founded upon the same transaction, arose out of the same nucleus of operative facts, and sought redress for essentially the same basic wrong[.]" *Wilmington Tr. Co.*, 81 A.3d at 375 (citation omitted) (internal quotation marks omitted). Notably, "[c]laim preclusion may apply even where a suit relies on a legal theory not advanced in the first case, seeks different relief than that sought in the first case, or involves evidence different from the evidence relevant to the first case." <u>Id.</u> (citation omitted) (internal quotation marks omitted).
>
> Applying these principles to the present case, we have no difficulty concluding that the third element of the claim preclusion doctrine has been met.

*Kittery Point Partners, LLC*, 623 B.R. at 838–39; *see also Allen*, 2010 WL 1558123 ("'Under principles usually analogized to res judicata, a defendant who fails to interpose a compulsory counterclaim as required by Rule 13(a) is precluded from later maintaining another action on the claim after rendition of judgment." *Keybank Nat'l Ass'n v. Sargent,* 2000 ME 153, 117, 758 A.2d 528, 534 (quotation marks omitted). 'When the second claim arises out of the same transaction as the first, previously-litigated claim, the second claim is barred by M.R. Civ. P. 13(a)(1).' *Id.* (quotation marks omitted).").

> To determine whether the matter[s] presented for decision in the instant action were or might have been litigated in the prior action, we examine whether the same cause of action was before the court in the prior case." *In re Kaleb D.,* 2001 ME 55, ¶ 8, 769 A.2d 179 (quotation marks omitted). We define a cause of action through a "transactional test," *id.,* which "examin[es] the aggregate of connected operative facts that can be handled together conveniently for purposes of trial to determine if they were founded upon the same transaction, arose out of the same nucleus of operative facts, and sought redress for essentially the same basic wrong," *Sebra v. Wentworth,* 2010 ME 21, ¶ 12, 990 A.2d 538 (quotation marks omitted).
>
> Put another way, [w]hat factual grouping constitutes a transaction [is] to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they [form] a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

*Wilmington Tr. Co.*, 2013 ME 94, ¶ 8, 81 A.3d at 375; *see also Jones v. Porter*, 438 F. Supp. 3d 101, 105 (D. Me. 2020) ("Here, despite Plaintiff's efforts to frame her contract claims as torts, it is clear that she is alleging some sort of prenuptial agreement that she could have presented to the divorce court…. Under these circumstances, the doctrine of res judicata applies, and that doctrine bars relitigation of claims that might have been raised in the divorce proceeding.").

30. Here, <u>both</u> Beliveau <u>and</u> Mattson in the Business Court Action asserted competing breach of contract claims and related claims against each other for alleged breaches of the Exit Agreement and all their respective and other obligations arising thereunder. Beliveau specifically

alleged and asserted breach of contract and contractual indemnity claims arising under the Exit Agreement against Mattson and, in turn, Mattson specifically alleged and asserted counterclaim breach of contract and breach of "express and/or implied" claims against Beliveau under and relating to the Exit Agreement or arising out of their business relationships and dealings.[9]

31. Mattson also alleged and asserted a counterclaim against Beliveau for damages arising from Beliveau's purported failure to conduct a commercially reasonable secured-party sale of Mattson's membership interests in Newcastle Ventures under Article 9 of Maine's Uniform Commercial Code. *See* Amended Counterclaim attached with Exhibit A.

32. Here, the Trustee is once again seeking damages against Beliveau for breaches of his purported obligations to Mattson arising under and with respect to the Exit Agreement. *See* Complaint, Counts I, II, and IV. The only thing different now from the prior action is that the Trustee has changed the legal theory for relief. Instead of characterizing and pursuing those claims for damages against Beliveau on breach of contract and related bases, the Trustee is now advancing the new (and invented) legal theory that Beliveau's liability under the Exit Agreement stems from a purported "partnership" between Mattson and Beliveau. *See* Complaint ¶¶ 21 – 100, 102 – 133, 170 – 179.

33. Yet none of the historical facts preceding the Business Court Action or this Adversary Proceeding have changed or are different. None of the documents and agreements, including the Exit Agreement, are different or new. Mattson <u>could</u> have sued Beliveau in the Business Court Action for breaches and violations of their purported (and apparently secret and unknown to anyone) decades-long "partnership" under the Maine's Uniform Partnership Act, just

---

[9] *See* Amended Complaint, dated July 13, 2023, filed in Business Court Action ("<u>Complaint</u>"), and attached hereto as Exhibit E; *see also* Counterclaim attached hereto with Exhibit A.

as the Trustee is doing now here. All the common and operative nucleus facts for advancing either the contract claims actually asserted in the Business Court Action, or the Trustee's newly-invented partnership legal theory advanced in his Complaint here, are the same, and both alternative legal theories could have been handled and addressed in that prior case.[10]

34. In fact, under Maine Rule of Civil Procedure 13(a)(1), to the extent that Mattson did, in fact, possess partnership claims against Beliveau in the Business Court Action under the alleged facts, documents, and affirmative claims alleged in the Amended Complaint, those partnership counterclaims were unquestionably compulsory and Mattson was obligated as a matter of law to bring them in that prior case – or be barred from ever doing so. *See KeyBank Nat. Ass'n v. Sargent*, 2000 ME 153, ¶ 17, 758 A.2d 528, 534 ("When "the second claim arises out of the same transaction as the first, previously-litigated claim," the second claim is barred by M.R. Civ. P. 13(a)(1).").

35. With regard to Count VIII of the Complaint and Beliveau's purported failure to conduct a commercially reasonable secured-party sale of Mattson's membership interests in Newcastle Ventures, that claim is literally the <u>same</u> claim that Mattson alleged against Beliveau in Count III of his Amended Counterclaim in the Business Court Action. *See* Complaint 291 – 297; *see also* Amended Counterclaim (Exhibit A) ¶¶ 46 – 50.

36. For all the reasons, the Trustee's State Law Claims are barred by the res judicata doctrine as a matter of law, because: (i) the Trustee is in privity with Mattson as his statutory successor; (ii) the Stipulated Judgment is a final judgment of the Business Court; and (iii) the Trustee's State Law Claims were either actually asserted in the Business Court Action, or they could have been advanced under alternative and different legal theories given the common and

[10] Mattson was represented by George J. Marcus, Esq. in the Business Court Action.

connected nucleus of operative facts relating to the Exit Agreement and Mattson's and Beliveau's prelitigation business relationships.

37. Counts I, II, IV, and VIII of the Complaint should be dismissed.

### C. Count VII of the Complaint Fails to Allege Facts That Mattson Made the Transfer of his Membership Interests to the Nevens, By Virtue of Beliveau's Secured Party Sale, With Actual Intent to Hinder, Delay or Defraud any Creditor of Mattson, and the Trustee's Actual Intent Avoidance Claim under § 544(b) of the Code Must be Dismissed

38. The Trustee alleges in Count VII of the Complaint that Beliveau's secured-party sale of Mattson's membership interests in Newcastle Ventures in August 2019 to Nevens – *i.e.*, the Secured Party Sale – is voidable, as either a constructively or actually fraudulent transfer pursuant to § 544(b) of the Code and 14 M.R.S. §§ 3575 and 3576 of the Maine Uniform Fraudulent Transfer Act ("MUFTA"). *See* Complaint ¶ 272.

39. "The Bankruptcy Code empowers a bankruptcy trustee to set aside, or 'avoid,' certain transfers of a debtor's assets in order to recover those assets for the benefit of the bankruptcy estate.... Under that provision [§ 544(b)], a trustee may avoid certain transfers that would be 'voidable under applicable law' – that is, voidable outside of bankruptcy proceedings. 11 U.S.C. § 544(b)(1). Trustees typically rely on state statutes to supply the 'applicable law' when suing under § 544(b) to avoid a debtor's transfer of assets." *United States v. Miller*, 604 U.S. 518, 522 (2025).

40. With respect to the Trustee's actual intent avoidance claim under § 3575(1)(A) of MUFTA in Count VII, simply put, on its face, it is nonsensical as a matter of fact and law.

41. In Count VII, the Trustee alleges that Mattson made an involuntary transfer (via the Secured Party Sale conducted by Beliveau in 2019) of his membership interests in Newcastle Ventures to the Nevens (not Beliveau) with the actual intent of hindering, delaying or defrauding

creditors of Beliveau (notwithstanding § 3575(1)(A)'s express requirement that any defrauded parties be a "creditor of the debtor") (emphasis added), by virtue of a scheme orchestrated with Beliveau two years earlier when they executed the Exit Agreement in 2017. That is ridiculous.

42. At its most basic level, it is difficult to conceive of any scenario in which a secured creditor could foreclose a security interest, pledge, or mortgage, thereby involuntarily effectuating a "transfer" from a "debtor" to a third-party, but then have that transfer avoided because the "debtor" "made" the transfer with the "actual intent to hinder, delay or defraud any creditor of the debtor[.]" 14 M.R.S. § 3575(1)(A). How does a debtor involuntarily separated from its asset by a foreclosing secured creditor actually intend for that involuntary transfer to hinder, delay or defraud that debtor's creditors? That would take some expert-level collusion and planning to say the least. And yet, that is exactly what the Trustee alleges in Count VII.

43. In support of the Trustee's claim for avoidance of the "Secured Party Sale" for actual fraud under § 544(b) and § 3575(1)(A) of MUFTA, the Complaint alleges the following:

- "On information and belief, the Exit Agreement was part of a scheme of Beliveau to extricate himself from payment of just debts to creditors." Complaint ¶ 225 (emphasis added);[11]

- "The Exit Agreement was made with the actual intent to hinder delay or defraud creditors of Mattson and Beliveau from reaching Beliveau's assets." *Id* ¶ 226 (emphasis added);

- "The transfer of Mattson's membership interest in Newcastle Ventures, LLC, by Secured Party Sale was made as part of a scheme to defraud creditors of Mattson and Beliveau and to divert assets to Beliveau and away from creditors." *Id.* ¶ 279;

[11] *See Browder v. Ojikutu*, 2025 WL 2379682, at *7 (D. Mass. Aug. 15, 2025), *appeal dismissed sub nom. Browder v. City of Boston*, 2025 WL 4679095 (1st Cir. Dec. 17, 2025) ("Plaintiff attempts to fix any plausibility deficiencies by inserting "on information and belief." However, as discussed above, those words inherently have no value when not supported with specific facts."); *In re Apellis Pharmaceuticals, Inc. Sec. Litig.*, 2025 WL 836491, at *5 (D. Mass. Mar. 17, 2025), aff'd, 188 F.4th 74 (1st Cir. 2026) ("While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable, as is true when pleadings for other causes of action are tested by motion to dismiss under Rule 12(b)(6).").

- "The transfer of Mattson's membership interest in Newcastle Ventures, LLC, by Secured Party Sale was made as part of a scheme detailed in Count VI hereinabove to hinder delay or defraud creditors of the partnership and creditors of Mattson." *Id.* ¶ 280;

- "Badges of fraud exist sufficient to conclude that the Secured Party Sale was actually intended to hinder, delay or defraud creditors." *Id.* ¶ 284.[12]

44 The foregoing bare allegations of "facts" and conclusory statements of law fail to state or plead a plausible claim for relief for an actual intent avoidance claim relating to the Secured Party Sale under § 544(b) and § 3575(1)(A) of MUFTA.

45. The foregoing alleged facts, as a matter of law, do not, and could not ever, plausibly state a claim for relief for actual intent avoidance relating to the Secured Party Sale under § 544(b) of the Code and § 3575(1)(A) of MUFTA.

Section 3575(1)(A) of MUFTA provides as follows:

> 1. Fraudulent transfer. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> A. With actual intent to hinder, delay or defraud any creditor of the debtor;

14 M.R.S. § 3575(1)(A) (emphasis added).

46. Here, the Trustee alleges that Beliveau acted with actual intent to hinder, delay or defraud his creditors, but § 3575(1)(A) requires that Mattson (as "debtor") have acted with the actual intent to hinder, delay or defraud Mattson's creditors. Complaint ¶¶ 225, 226, 279. What Count VII actually alleges is legally insufficient for purposes of a viable claim under § 3575(1)(A).

47. There is simply no way to square the Trustee's allegations and claim of actual intent fraudulent transfer in Count VII with the applicable statutes, other than to conclude that the Trustee

---

[12] The Court need not credit conclusory legal allegations. *See Cheng*, 51 F.4th at 443.

and his co-counsel, Alan F. Braunstein, Esq., gave no real thought to the bona fides of that claim before they just parroted the elements of the cause of action against Beliveau and the Nevens.

48. The Trustee's actual intent fraudulent transfer claim in Count VII of the Complaint should be dismissed.

**D. Count VI of the Complaint Fails to Allege Facts That Mattson Made the Transfers Under the Exit Agreement With Actual Intent to Hinder, Delay or Defraud any Creditor of Mattson, and the Trustee's Actual Intent Avoidance Claim under § 544(b) of the Code Must be Dismissed**

49. In Count VI of the Complaint, the Trustee alleges that the transfers effectuated by the Exit Agreement are voidable, as constituting either constructively or actually fraudulent transfers pursuant to § 544(b) of the Code and § 3575(1)(A) and (B) of MUFTA. *See* Complaint ¶¶ 202 – 232.

50. With respect to the Trustee's actual intent avoidance claim under § 3575(1)(A) of MUFTA in Count VII, the Trustee alleges that the "Exit Agreement was designed to insulate Beliveau from creditors' claims . . . ." Complaint ¶ 216 ("The purpose of the Exit Agreement was to 'minimize Severin's liabilities on the Guaranteed Loans and the assumed Loans.' Exit Agreement, p. 1.") (emphasis added). He further alleges that, "[n]n information and belief, the Exit Agreement was part of a scheme of Beliveau to extricate himself from payment of just debts to creditors." *Id.* ¶ 225 (emphasis added). "The Exit Agreement was made with the actual intent to hinder delay or defraud creditors of Mattson and Beliveau from reaching Beliveau's assets." *Id.* ¶ 226 (emphasis added).

51. Fine. Accepting all the foregoing factual allegations as true, the Trustee's actual intent fraudulent transfer claim under § 3575(1)(A) has to be dismissed because none of the Trustee's allegations state that the purported transfers were made by Mattson with "actual intent

to hinder, delay or defraud any creditor of the debtor" – as opposed to creditors of Beliveau – which is required for liability under that section.

52. And, again, the Trustee also places all the intent and scienter of the purported Exit Agreement "scheme" upon Beliveau, not Mattson. *See* Complaint ¶¶ 216, 224, 225, 226. But whatever Beliveau's intent may have been in entering into the Exit Agreement is irrelevant to whether Mattson (as "debtor") made the alleged fraudulent transfers through the Exit Agreement "[w]ith actual intent to hinder, delay or defraud any creditor of the debtor." 14 M.R.S. § 3575(1)(A).

53. As with Count VII discussed above, the Trustee's theory for actual intent fraudulent transfer is completely backwards and entirely deficient as a matter of law as pled. While the Trustee may want to paint Beliveau as the bad guy vis-à-vis Mattson because he is now aligned with Mattson and their interests in settling scores with Beliveau, it is self-defeating when the Trustee allows his personal animus and bias toward Beliveau and undersigned counsel to undermine the claims he so clearly and desperately wants to bring to cause Beliveau to incur legal fees in defending this baseless and legally non-viable action.

54. Finally, to the extent that the Trustee's basic failure to simply just plead facts in alignment with the requisite elements of the § 3575(1)(A), the claim is still legally deficient because those thread-bare facts and conclusory parroting of the elements fail to meet "Rule 9(b)'s heightened pleading standard" applicable to actual intent fraudulent transfer claims. *In re Telexfree*, LLC, 2023 WL 2168044, at *6 (Bankr. D. Mass. Feb. 22, 2023)

> Federal Rule of Civil Procedure 9(b) imposes a heightened pleading requirement on plaintiffs alleging fraud…. Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity….

*Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir. 1997) (citations and quotations omitted).

> to properly plead fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This standard requires averment of the facts as to whom, about what, where, and when the allegedly false or fraudulent representation took place. *See Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 15 (1st Cir. 2004). If a complaint does not meet Rule 9(b)'s heightened pleading standard, it is insufficient and will be dismissed.

*Niazi v. McKinsey & Co., Inc. United States*, 2023 WL 4627981, at *2 (D. Mass. July 19, 2023); *Goodson v. Agonte-Flores*, 2026 WL 3438121 (D. Puerto Rico), 3 (July 24, 2026) ("even when allegations are made upon information and belief, the complaint must set forth the factual basis supporting that belief…. Compliance with the heightened pleading standard of Rule 9(b) is required even when plaintiff does not explicitly claim fraud, but his allegations nonetheless sound like fraud.").

55. The Trustee alleges, for example, that, "[o]n information and belief, the Exit Agreement was part of a scheme of Beliveau to extricate himself from payment of just debts to creditors." Complaint ¶ 225. What are the Trustee's additional factual bases that the Exit Agreement was a scheme to protect him and his assets from his creditors?[13] Was Mattson part of that scheme? And if so, was Mattson actively, intentionally, and cooperatively participating in that scheme, or was he blind to Beliveau's ill-intentions and motivations to protect himself at the expense of Mattson? And why in the world would Mattson actively and knowingly participate in a scheme that was specifically designed to benefit just Beliveau specifically at Mattson's expense? That is nonsensical.

56. Beliveau does not know the answer to any of these questions because the Trustee has not pled any specific facts, with particularly, of the who, what, where, why or when to enlighten him, or this Court, on the plausibility of his actual intention fraudulent transfer claim relating to the Exit Agreement under MUFTA.

[13] *See* fn. 11, *supra*.

57. As with Count VII, the Trustee's actual intent fraudulent transfer claim in Count VI relating to the Exit Agreement makes no sense and fails to state a plausible claim for relief.

**E. Count IX of the Complaint Should be Dismissed Because: (1) It Fails to State a Claim as a Matter of Fact and Law; and (2) Under Directly Applicable and Specific Maine Law, 31 M.R.S. § 1573, the Trustee Was Not a Hypothetical Judicial Lien or Execution Creditor on the Filing Date under § 544(a) with Respect to Mattson's Membership Interests (if any) in Harpers Development LLC or as to the Harpers Development Receivable**

58. In Count IX of the Complaint, the Trustee alleges that §§ 541 and 544(a) of the Code entitle him to collect from Beliveau "[a]ll Debtor's right [sic] title and interest in or to Harpers Development, LLC, any assets of or formerly Harpers Development, LLC, any proceeds from the Harpers Development Receivable,[14] or any membership interest in Harpers Development, LLC…." Complaint ¶¶ 330 and 339 ("The bankruptcy estate holds the power to avoid transfers avoidable by a hypothetical attaching lien, or judgment creditor as of the date of the petition. 11 U.S.C. §544(a).").

59. The mechanism through which the Trustee seeks relief in this Count is his so-called strong-arm powers under § 544(a) of the Code, which grants to him ideal hypothetical judgment lien and execution creditor status, as of the Filing Date, with respect to any unperfected lien (as determined under applicable state law) of a competing party to the same personal property which, in this instance, is Beliveau concerning Mattson's membership interests (if any) in Harpers Development (and, purportedly, the Harpers Development Receivable).

60. "Under § 544(a)(1), '[a] trustee in bankruptcy has, as of the commencement of the case, the status of a hypothetical lien creditor and is empowered to avoid any transfer of property of the debtor that could be avoided by such creditor.' *BankBoston,* 256 B.R. at 350." *In re*

[14] The "Harpers Development Receivable" is, unhelpfully for pleading purposes, not defined in the Complaint. *See* Complaint ¶ 318. Rather, that defined term is set forth in the Transfer Agreement, which is attached hereto as Exhibit C.

*Mollison*, 463 B.R. 169, 185 (Bankr. D. Mass. 2012). "The purpose of the 'strong arm clause' is to cut off unperfected security interests, secret liens, and undisclosed prepetition claims against the debtor's property as of the commencement of the case.' *Ostrander v. Gardner (In re Millivision, Inc.*), 331 B.R. 515, 522 n. 12 (Bankr.D.Mass.2005), *aff'd* 474 F.3d 4 (1st Cir.2007) (quoting Collier on Bankr. (Alan N. Resnick & Henry J. Sommer eds., 15th ed. 2005) ¶ 544.03)." *Id.* at 186.

61. "The rights of the Trustee as a hypothetical lien creditor under § 544(a)(1) are determined under state law." *In re Mollison*, 463 B.R. at 186; *In re The Ground Round, Inc.*, 482 F.3d 15, 20 (1st Cir. 2007) ("Section 544 invokes state law – here, Pennsylvania's law – to determine the rights of the hypothetical lien creditor…. And, under state law as it stood when the lease was made, it appears that a contract-claim litigant could *not* have obtained a lien on the liquor license.") (citation omitted; emphasis in original).

62. For purposes of this Motion, there are two reasons why Count IX lacks legal viability and fails to state a claim upon which relief may be granted. They are discussed below.

**1. What "Transfer" is Allegedly Sought to Be Avoided under § 544(a), Because <u>Not Even the Trustee Seems to Know Based upon the Alleged Facts</u>**

63. The facts alleged in Count IX are convoluted, contradictory, and devoid of precision or clarity, probably on purpose so as to create enough ambiguity on the viability of the § 544(a) claim to have it survive a motion to dismiss. Because of that, Beliveau does his best below to summarize and bring clarity to the alleged facts so the Court can better understand exactly which alleged "transfer" to Beliveau the Trustee seeks to avoid under § 544(a) of the Code.

64. Fortunately, notwithstanding the Trustee's muddied and incoherent approach to drafting, none of this is terribly complicated if you understand the actual facts and how the law works.

65. Harpers Development was a Maine limited liability company formed in 2001. Complaint ¶ 303.[15] The original members of Harpers Development were Beliveau, Mattson, John Orestis ("Orestis"), and Spicewood Family Partners, LTD ("Spicewood").[16] *Id.* ¶ 306. They each owned a ¼ membership interest in Harpers Development.[17]

66. Central Maine Commerce Center, L.P. ("CMCC") was a Maine limited partnership. Complaint ¶ 300, 301. CMCC's general partner was the Maine limited liability company, Commerce Center Management, LLC ("CCM"). *Id.* ¶ 301. The Complaint alleges that the members of CCM were Beliveau, Orestis, Spicewood, and Mattson. *Id.* It further alleges that they each owned a ¼ membership interest in CCM.

67. Sometime before 2016, Harpers Development made a loan to CMCC in the amount of $322,020. Complaint ¶¶ 304, 314, 332. To date, CMCC has not repaid Harpers Development for the loan Harpers Development made to CMCC prior to 2016. *Id.* ¶¶ 305, 325, 333.[18]

68. In 2018, Mattson filed a certificate of cancellation for Harpers Development with the Maine Secretary of State. Complaint ¶ 308.

---

[15] *But see* Complaint ¶ 23 ("Their partnership used the name 'Harpers Development.'"). No, no they did not, because Harpers Development was a Maine limited liability company, but if the Trustee is willing to allege whatever he needs to allege in federal court to support a made up legal theory for relief, then he is.

[16] The principal of Spicewood is Chris Harte.

[17] The Maine Limited Liability Company Act ("Act") does not define the term "membership interest." *See* 31 M.R.S. § 1502. Rather, the Act defines and uses the term "transferrable interest" to describe a member's right to receive distributions from a limited liability company. *See* 31 M.R.S. § 1502(29) ("29. Transferable interest. 'Transferable interest' means the right, as originally associated with a person's capacity as a member, to receive distributions from a limited liability company in accordance with the limited liability company agreement, whether or not the person remains a member or continues to own any part of the right."). 31 M.R.S.A. § 1502. The terms transferrable interest and membership interest are nevertheless commonly used interchangeably because they mean the same thing, and that is also done here. A membership interest is simply the right of a member or transferee to receive a distribution from a limited liability company. More on that later.

[18] While not relevant or necessary for this Motion, the loan from Harpers Development to CMCC was made in 2011. There is no promissory note – not because it has been lost over these last 16 years, but because one was never drafted.

69. In 2019, 6 ECS, LLC ("6 ECS") commenced an action against Beliveau and Mattson to collect alleged amounts due in the action entitled Ronald Berube v. Verus Capital, LLC, BCD-CIV-2019-00060 ("6 ECS Action"). Complaint ¶ 310. In 2020, Beliveau settled with 6 ECS (Plaintiffs' successor entity). *Id.* ¶ 311.

70. As part of Beliveau's settlement with 6 ECS, in 2020, he assigned whatever membership interests he possessed in Harpers Development to 6 ECS. Complaint ¶¶ 311, 312.[19] At the time, Beliveau possessed at least his 25% membership interest in Harpers Development, and he and Mattson believed that Beliveau also possessed Mattson's 25% membership interest in Harpers Development (*i.e.*, for a potential total 50% membership interest being assigned from Beliveau to 6 ECS). *Id.* ¶ 313; *see also* Transfer Agreement.

71. As alleged in the Complaint, Mattson agreed that if it turned out Beliveau did not, in fact, at the time possess Mattson's 25% membership interest in Harpers Development, then he would nonetheless assign and transfer his 25% interest directly to 6 ECS. Complaint ¶ 315; *see also* Transfer Agreement.[20] Based upon the allegations in the Trustee's Complaint, it appears that Mattson changed his mind and he failed to transfer his 25% membership interest to 6 ECS.[21] According to the Trustee's Complaint, as of the Filing Date, Mattson still owned his 25% membership interest in Harpers Development. Complaint ¶¶ 317, 318, 327, 330 (notwithstanding all the documents executed by Mattson to date providing otherwise).

---

[19] *See also* Transfer Agreement (Exhibit C).

[20] At all relevant times Mattson was cooperating and colluding with 6 ECS in the pursuit of 6 ECS's claims against Beliveau and because 6 ECS was a critical funding source for Mattson, but those facts are not necessary for the Court's determination of the Motion here.

[21] Those are certainly interesting counterfactual allegations because that was definitely not the position 6 ECS took and alleged when it sued Beliveau in 2024 for claimed breaches of the "2020 6ECS Settlement". *See* Complaint ¶¶ 311, 328 (*see* 6 ECS, LLC, *et al.* v. Severin M. Beliveau, *et al.*, Docket No. PORSC-CIV-2024-00055) (defined in Complaint as "2024 ECS Litigation"). In the 2024 ECS Litigation, it was 6 ECS's position that it absolutely owned 50% of the membership interests in Harpers Development.

72. In 2023, CMCC sold substantially all its assets for $18.5 million dollars. Complaint ¶¶ 323, 324. But, even though CMCC allegedly possessed sufficient funds at closing to repay its outstanding loan to Harpers Development (from over 7 years earlier and after Mattson cancelled Harpers Development 5 years earlier in 2018), it failed to do so, and the outstanding debt due from CMCC to Harpers Development remains due and owing today. Complaint ¶¶ 325, 333, 336.

73. Two years later, in 2025, Beliveau again settled with 6 ECS, this time in the "2024 ECS Litigation." Complaint ¶ 334. The next factual allegation in the Trustee's Complaint – which is also made "[o]n information and belief" – is <u>the</u> critical and determinative factual allegation for whether Count IX is legally plausible and viable based upon the facts alleged:

> 335. On information and belief, the 2025 settlement of the 2024 ECS Litigation included the payment of the Debtor's interest in the Harpers Receivable to or for the benefit of Beliveau.

Complaint ¶ 335. For clarity sake, the "Harpers Receivable" is defined in the Transfer Agreement (actually as the "Harpers Development Receivable") as follows:

> WHEREAS, Harpers Development loaned certain amounts or otherwise provided value to Central Maine Commerce Center, LP, which loan obligation or value currently has an outstanding balance of approximately between **<u>$322,000.00</u>** and **<u>$500,000.00</u>** (the "<u>Harpers Development Receivable</u>").

In other words, the Harpers Development Receivable (or Harpers Receivable as alleged in ¶ 335) is <u>the loan</u> due from CMCC to Harpers Development.

74. The Trustee alleges that no portion of the Harpers Receivable has been paid to the estate. Complaint ¶ 336. The Trustee alleges that the right to recover the Harpers Receivable is a general intangible under Maine state law. *Id.* ¶ 337. And because Beliveau did not possess a perfected interest in any general intangibles of Mattson as of the Filing Date, the Trustee "is entitled to a money judgment equal to [sic] value of the rights transferred. 11 U.S.C. §550 (a)(1)." Complaint ¶ 342.

75. If the Court concludes that the foregoing fairly captures the alleged facts set forth in Count IX of the Complaint, then it is impossible for the claim to be legally viable.

76. At the risk of putting too fine a point on it, the key factual allegations underpinning the claim are internally inconsistent and contradictory – the Trustee alleges that, to this day, CMCC has never repaid the loan due to Harpers Development (*i.e.*, the Harpers Development Receivable), but yet Beliveau received a "payment of the Debtor's interest in the Harpers Receivable" through his settlement with 6 ECS in 2025. Complaint ¶ 335.

77. That is impossible. How can Beliveau receive a payment on a loan that the Trustee, himself, alleges has never been paid by the obligor in the first place. On just the alleged facts alone, Count IX is not plausible because the circumstances giving rise to Beliveau's purported liability could never support the Trustee's legal claim and theory.

78. Nor does the Court even need to credit ¶ 335 in any event because it is made "on information and belief," and the Trustee has offered exactly zero supporting facts or documents to underlie and support the bare and conclusory allegation in that paragraph (emphasis added) that "the 2025 settlement of the 2024 ECS Litigation included the payment of the Debtor's interest in the Harpers Receivable to or for the benefit of Beliveau." *In re Martin*, 419 B.R. 524, 529 (Bankr. D.N.H. 2009) ("Support for this allegation is based on information and belief; however, the Plaintiffs do not provide facts on which that belief is formed. *See Greebel v. FTP Software, Inc.,* 194 F.3d 185, 191 (1st Cir. 1999) (allegations made on information and belief must provide factual support for such belief). Accordingly, the Court dismisses Count I for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6).").

79. Without credible and properly supported allegations of fact in ¶ 335 of the Complaint, or any other factual allegations supporting how the Trustee believes Beliveau received

a payment on the Harpers Development Receivable in settlement of an unrelated lawsuit in 2025 in which Mattson was not even a party on a loan that is still outstanding, the entire house of cards upon which Count IX is constructed collapses. All this renders Count IX implausible as alleged.

**2. Under Maine Statutory Law, the "Exclusive" Manner in Which any Judgment Creditor Can Obtain a Lien Against a Judgment Debtor's Transferrable (*i.e.*, Membership) Interest in a Limited Liability Company is Through a Charging Order under 31 M.RS. § 1573, Which Can Only be Obtained Post-Judgment**

80. Count IX must also be dismissed on the purely legal ground that the plain language of § 544(a)(1) and (2) do not, under applicable and underlying Maine state law, permit the Trustee as of the Filing Date to possess either hypothetical judicial or execution lien status with respect to Mattson's membership interests in Harpers Development.

81. In short, under Maine law, it is impossible for any plaintiff to obtain a prejudgment attachment or attachment on trustee process of a membership interest in a limited liability company, such as Mattson's purported membership interest in Harpers Development. It is similarly impossible for any judgment creditor to obtain an execution or execution lien against a membership interest in a limited liability company through reliance on a writ of execution alone.

82. Under Maine law, the only way to obtain a lien against a membership interest is through a charging order, pursuant to 31 M.R.S. § 1573, issued by the Maine District Court in connection with a disclosure proceeding commenced under 14 M.R.S. §§ 3120 – 3138.

83. Section 1573 provides in part as follows:

> **1. Transferable interest of judgment debtor.** On application to a court of competent jurisdiction by any judgment creditor of a member or transferee, the court may charge the transferable interest of the judgment debtor with payment of the unsatisfied amount of the judgment with interest. To the extent so charged and after the limited liability company has been served with the charging order and its terms, the judgment creditor has only the right to receive any distribution or distributions to which the judgment debtor would otherwise be entitled in respect of such transferable interest….

> **3. Lien.** A charging order constitutes a lien on the judgment debtor's transferable interest. The charging order lien may not be foreclosed upon under this chapter or any other law….
>
> **6. No right to property**. Subject to the laws against fraudulent conveyances, a judgment creditor of a judgment debtor who is a member or transferee has no right to obtain possession of, or otherwise exercise legal or equitable remedies with respect to, the property of a limited liability company….
>
> **7. Exclusive remedy**. This section provides the exclusive remedy by which a judgment creditor of a member or transferee may satisfy a judgment out of the judgment debtor's transferable interest, and the judgment creditor may not foreclose upon the charging order or the judgment debtor's transferable interest.

31 M.R.S.A. § 1573(1), (3), (6), (7).

84. All competent Maine creditor rights attorneys know that § 1573 provides the exclusive path for obtaining a lien against a judgment debtor's membership interests in a limited liability company in order to legally intercept any distributions a company may make on account of that membership interest. By the express and specific statutory authority of that section, filing a writ of execution (or a trustee process) with the Maine Secretary of State along with a UCC-1 Financing Statement does not, as a matter of law, create a judicial lien against a defendant's/judgment debtor's membership interests in a limited liability company in favor of the attaching or judgment creditor. *See* 31 M.R.S. § 1573(3), (7).

85. It makes no difference that a membership interest is or may be a general intangible for purposes of Maine's Article 9-A, because 31 M.R.S. § 1573(7) expressly states that that statute provides the "exclusive remedy" by which judgment creditors may exercise and enforce rights against a judgment debtor's membership interest. *See also Cent. Maine Power Co. v. Devereux Marine, Inc.*, 2013 ME 37, ¶ 22, 68 A.3d 1262, 1269 ("To interpret section 760 statute to allow for proportioned liability on the basis of the broadly applicable statute governing comparative fault would, however, violate the fundamental rule of statutory construction that we favor the

application of a specific statutory provision over the application of a more general provision when there is any inconsistency."); *compare* Complaint ¶¶ 340 (14 M.R.S § 4151); 341 (11 M.R.S. § 9-1317(1)).

86. It is also notable that, in order to obtain a charging order, a party needs to be a "judgment creditor" of the "judgment debtor," and that status arises only after a final judgment is rendered against the judgment debtor and a writ of execution is issued on the judgment. *See* 14 M.R.S. § 3126 (requiring the filing of writ of execution with Clerk to commence a disclosure proceeding). The plain language of § 1573, therefore, eliminates completely the ability of any party with just a prejudgment attachment or attachment on trustee process from employing the statute or obtaining a lien against a membership interest.

87. As discussed above, the "rights of the Trustee as a hypothetical lien creditor under § 544(a)(1) are determined under state law." *In re Mollison*, 463 B.R. at 186; *In re The Ground Round, Inc.*, 482 F.3d at 20 ("under state law as it stood when the lease was made, it appears that a contract-claim litigant could *not* have obtained a lien on the liquor license.").

88. Here, directly applicable and specific statutory Maine law, *i.e.*, 31 M.R.S. § 1573, bars and precludes the Trustee from maintaining hypothetical judicial or execution lien status under § 544(a)(1) or (2) as to Mattson's alleged membership interests in Harpers Development as of the Filing Date.

89. Nor, importantly, did Mattson as of the Filing Date (and therefore the Trustee now) possess any economic interest in the Harpers Development Receivable itself, *i.e.*, CMCC's alleged loan to Harpers Development. *See, e.g., Kondaur Capital Corp. v. Hankins*, 2011 ME 82, ¶ 11, 25 A.3d 960, 962 ("Absent an interest in the note, Liquidation Properties did not have standing to

commence this foreclosure action. *See Saunders,* 2010 ME 79, ¶ 15, 2 A.3d at 297."); *see also* 31 M.R.S. §§ 1505, 1544.

90. Under the Act, and taking the Trustee's allegations as true that Mattson still possesses his (shockingly) unscheduled 25% membership interest in Harpers Development, Mattson only possesses an economic interest in whatever distribution that Harpers Development may make to its members or transferees from any originating sources, including the alleged loan to CMCC if it ever monetizes, which the Trustee alleges has not yet occurred. Without a direct economic interest in the loan itself (*i.e.*, Harpers Development Receivable), Mattson, as of the Filing Date (and therefore the estate), lacked (and the Trustee lacks now) any legal standing to pursue payment of the loan from CMCC. *See Black v. Bureau of Parks & Lands*, 2022 ME 58, ¶ 27, 288 A.3d 346, 359 ("Standing is a threshold issue and Maine courts are only open to those who meet this basic requirement.").

91. Beliveau has obviously cited no cases under Maine law confirming the foregoing singular path for obtaining a lien against a membership interest by way of a charging order under 31 M.R.S. § 1573. The reason is simple. There are none. Since the statute's enactment in 2009, all competent creditor rights attorneys and Maine courts have understood § 1573 to mean what it says, and there is no other known legally viable method under Maine law for obtaining a lien in a membership interest.

92. Suffice to say, if the Court concludes otherwise here, it will be big news. Count IX should be dismissed.

**F. Count XI of the Complaint Must Be Dismissed Because the Business Court's Stipulated Judgment Plainly and Expressly Provides that Post-Judgment Interest, Costs, and Other Expenses Continue to Accrue on the Principal Amount of Beliveau's Stipulated Judgment Against Mattson**

93. In Count XI, the Trustee seeks the disallowance of Beliveau's Claim (No. 30-2) against the estate in any amount in excess of $288,020.00. Complaint ¶¶ 357.

94. There are only three ways in which the Trustee could have asserted this claim in his Complaint, and none of them are good:

(i) The Trustee did not read the Business Court's Stipulated Judgment;

(ii) The Trustee does not understand what the word "principal" means in judgments or financial contexts (a seriously distressing thought given that the Trustee is literally a Chapter 7 trustee somehow overseeing many bankruptcy cases); or

(iii) the Trustee did read the Stipulated Judgment, he does know what the word "principal" means in the Stipulated Judgment and in financial contexts, and he just decided to the allege the claim for disallowance anyway.

95. In July 2024, the Business Court issued in the Business Court Action its Judgment Enforcing Settlement in favor of Defendants and against Mattson "in the principal amount of $835,172.38, with post-judgment interest at the rate of 10.79%, plus allowable interest, costs, and other expenses incurred from and after that date in accordance with applicable law." *See* Exhibit A.

96. In August 2024, Mattson filed in the Business Court his Rule 60(b) Motion, in which he requested the following:

> Mattson seeks relief from the aspect of that Order [Judgment Enforcing Settlement] setting the principal amount of the judgment against him as $835,172.38. That figure was not calculated in accordance with the express provisions of the parties' underlying agreement [Settlement Agreement] and significantly overstates the principal amount contractually due and owing by Mattson."

*See* Exhibit D attached hereto (Rule 60(b) Motion, p. 1) (emphasis added); *see also* Rule 60(b) Motion, p. 8 ("Wherefore, Mattson respectfully requests that the Court issue an Order: A.

Correcting the principal amount of the judgment in the Order from $835,172.38 to $288,020.00; and B. Granting such other relief as the Court deems just and appropriate.") (emphasis added).

97. On September 9, 2024, the Business Court issued its Order correcting the Judgment Enforcing Settlement "such that the judgment against him [Mattson] is in the principal amount of $288,020.00, not $835,172.38." *See* Exhibit A (Order). In issuing its Order, the Court grounded its decision to correct the principal amount figure upon the "clear and unambiguous" terms of Settlement Agreement between Mattson and Defendants. *Id.*

98. The Business Court's Order did not address or disturb any of the other terms of its Judgment Enforcing Settlement, including its directive that "post-judgment interest at the rate of 10.79%" accrued on the principal amount due from Mattson to Defendants, "plus allowable interest, costs, and other expenses incurred from and after that date in accordance with applicable law." *See* Exhibit A attached hereto. None of which is surprising, because Mattson did not request in his Rule 60(b) Motion a modification of any other terms of the Judgment Enforcing Settlement other than the principal amount owed. *See* Exhibit D.

99. "In order to survive dismissal, a complaint need not set forth detailed factual allegations, . . . but it must contain sufficient factual matter ... to state a claim to relief that is plausible on its face." *In re Curran*, 855 F.3d at 25 (citations and quotations omitted); *Schatz*, 669 F.3d at 55–56 ("Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels us to draw on our judicial experience and common sense.") (citations and quotations omitted).

100. Here, the Business Court's Order and Judgment Enforcing Settlement directly contradict and explicitly reject the allegations of the Trustee's Complaint with respect to the proper amount due from Mattson to Beliveau under the Stipulated Judgment and in Claim 30-2. *See*

*Clorox Co. Puerto Rico*, 228 F.3d at 32 ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.").

101. For these reasons, Count XI does not now – nor could it ever – state even a possible claim for relief against Beliveau, much less a plausible one.

102. Count XI is embarrassing, and a little bit sad. It should be dismissed.

## III. Conclusion

WHEREFORE, Defendants, Severin M. Beliveau, Esq. and Cynthia Murray Beliveau, request that this Court dismiss, with prejudice: (i) Counts I, II, IV, VIII, IX, and XI in their entirety; (ii) the actual intent fraudulent transfer claims alleged in Counts VI and VII; (iii) that Court grant Defendants their legal fees and costs incurred in this proceeding; and (iv) that the Court grant them such other and further relief as is just and equitable under the circumstances.

Dated: November 15, 2026

/s/ Randy J. Creswell
Randy J. Creswell, Esq.
Counsel for Defendants,
Severin M. Beliveau, Esq. and
Cynthia Murray-Beliveau

CRESWELLLAW
PO Box 7340
Portland, ME 04112
207.358.1010
rcreswell@creswelllaw.com

## CERTIFICATE OF SERVICE

I, Randy J. Creswell, Esq., hereby certify that I have served on this day copies of the above Motion to Dismiss, proposed Order, Notice of Hearing, and this Certificate of Service upon each of the parties listed on the Notice of Electronic Filing via the Court's Administrative Procedures Governing the Filing and Service by Electronic Means (unless otherwise set forth below).

Dated: November 15, 2026

/s/ Randy J. Creswell
Randy J. Creswell, Esq.
Counsel for Defendants,
Severin M. Beliveau, Esq. and
Cynthia Murray-Beliveau

CRESWELLLAW
PO Box 7340
Portland, ME 04112
207.358.1010
rcreswell@creswelllaw.com

## Service List

Alan F. Braunstein, Esq. (via email only)
Co-counsel to Chapter 7 Trustee, Edmond J. Ford, Esq.